**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DILLON GREENO and MARLENE KING, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>CERNER CORPORATION D/B/A ORACLE HEALTH, ALBANY MED HEALTH SYSTEM and GLENS FALLS HOSPITAL,<br><br>Defendants. | Case No. 1:25-cv-1085(AMN/DJS)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Dillon Greeno and Marlene King ("Plaintiffs"), on behalf of themselves and all similarly situated persons, allege the following against Cerner Corporation d/b/a Oracle Health ("Oracle Health" or "Oracle"), Albany Med Health System ("Albany Health") and Glens Falls Hospital ("GFH") (collectively, "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## INTRODUCTION

1. Plaintiffs bring this class action against Oracle Health, Albany Med Health System, and GFH for their failure to properly secure and safeguard Plaintiff's and Class Members' personally identifiable information ("PII") and protected health information ("PHI" and collectively with PII, "Private Information") from cybercriminals.

2. Defendant Oracle Health is a healthcare software-as-a-service (SaaS) company offering electronic health record ("EHR") and business operations systems to hospitals and healthcare organizations.

3. Oracle Corporation, the parent company of Oracle Health, acquired the medical records giant Cerner Corporation for $28.3 billion in 2022, making Oracle the second largest EHR vendor in the United States—providing EHR services to over 20 percent of the U.S. hospitals.

4. After the acquisition, Oracle Corporation re-branded Cerner as Oracle Health and began the process of migrating Cerner systems to Oracle Cloud; however, some Cerner servers and the EHR data contained therein were not included in the migration.

5. Defendant Albany Health is a comprehensive healthcare network serving northeastern New York and western New England, operating multiple hospitals and healthcare facilities.

6. Defendant GFH is a member hospital of Albany Med Health System, providing medical services to patients in the Glens Falls, New York region and is a customer of Oracle Health's electronic health record services.

7. As part of their operations, Albany Health and GFH collect and store the Private Information of their patients and entrust the storage and management of such data, in part, to Oracle Health through its EHR vendor services.

8. In the course of doing business, Defendants are entrusted with the Private Information that patients provide to them.

9. Defendants' security failures led to a cyberattack that compromised legacy Cerner data servers that store patient data for multiple US healthcare organizations and hospitals.

10. According to a notice sent to impacted patients, on or about June 2, 2025, GFH learned that cybercriminals had gained access to patient information that was maintained by Cerner, their electronic health record vendor.

11. The vendor determined through an investigation that at least as early as January 22, 2025, an unauthorized third party gained access to personal health information on legacy Cerner systems and provided Cerner with a list of patients whose health information may have been involved in the incident (the "Data Breach").

12. The vendor informed GFH that law enforcement investigators directed a delay in notifying patients, as well as additional hospital customers, about this incident because it could have impeded their investigation.

13. This massive Data Breach affected multiple healthcare organizations using Cerner's legacy systems, with notifications being sent to patients as recently as August 1, 2025.

14. Oracle Health's lack of transparency and delayed notification, including the law enforcement-directed delay in providing official written reports to affected hospitals and sending data breach notices to affected patients and other victims, is not only frustrating but puts Plaintiffs and Class Members at significant risk of identity theft and various other forms of personal, social, and financial harm. This substantial and imminent risk will remain for their respective lifetimes.

15. Accordingly, Plaintiffs and Class Members bring this action against Defendants seeking redress for its unlawful conduct and asserting claims for: (i) negligence; (ii) breach of third-party beneficiary contract; (iii) breach of implied contract; (iv) unjust enrichment; (v) breach of confidence; (vi) breach of fiduciary duty; (vii) invasion of privacy; (viii) violation of the New York General Business Law §349; (ix) violation of the right to privacy under the New York Constitution and (x) declaratory judgment.

## PARTIES

16. Plaintiff Dillon Greeno is, and at all times mentioned herein was, an individual citizen of the state of New York.

17. Plaintiff Marlene King is, and at all times mentioned herein was, an individual citizen of the state of New York.

18. Defendant Cerner Corporation d/b/a Oracle Health is a Delaware corporation with its headquarters located at 8779 Hillcrest Road, Kansas City, Missouri 64138.

19. Defendant Albany Med Health System is a New York domestic not-for-profit corporation with its principal place of business located at 43 New Scotland Avenue, Albany, New York 12208.

20. Defendant Glens Falls Hospital is a New York domestic not-for-profit corporation with its principal place of business located at 100 Park Street, Glens Falls, New York 12801.

## JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom including Plaintiffs have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

22. This Court has personal jurisdiction over Defendant GFH because it operates in and has its principal place of business in this District.

23. This Court has personal jurisdiction over Defendant Albany Health because it operates in and has its principal place of business in this District.

24. This Court has personal jurisdiction over Defendant Oracle Health because it conducts substantial business in this District and contracts for goods or services in this District.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District, Defendant Oracle

Health, through its predecessor Cerner Corporation, maintains substantial operations in this District, the conduct relevant to this action occurred in part within this District, and Defendants have harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

### A. Defendants' Business and Collection of Plaintiffs' and Class Members' Private Information

26. Oracle Health, formerly known as Cerner Corporation, is a U.S.-based, multinational provider of various health information technology platforms and services, including EHR systems and software.

27. Albany Med Health System is a comprehensive healthcare network that includes Defendant GFH along with Albany Medical Center Hospital, Saratoga Hospital, and Columbia Memorial Health, together serving thousands of patients throughout northeastern New York and western New England.

28. GFH is a regional healthcare provider that offers medical services to patients in the Glens Falls, New York area. Cerner is GFH's third party vendor and provides electronic health records services to the hospital.

29. As a condition of receiving medical services from GFH and other Oracle's customers in the healthcare industry, patients are required to entrust Defendants with highly sensitive personal and health information.

30. On information and belief, in the ordinary course of their business of providing medical services, Albany Health, GFH, and Oracle maintain patient Private Information, including but not limited to:

a. Name, address, phone number and email address;

b. Date of birth;

c. Demographic information;

d. Social Security number;

e. Information relating to individual medical history;

f. Information concerning an individual's doctor, nurse or other medical providers;

g. Health insurance information;

h. Clinical testing information and results; and

i. Other information that Defendants may deem necessary to provide services and care.

31. The information held by Defendants in their computer systems and servers included the unencrypted Private Information of Plaintiffs and Class Members.

32. Albany Health, GFH and Oracle Health made promises and representations to patients that the Private Information collected from them as a condition of obtaining healthcare services would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendants would delete any sensitive information after they were no longer required to maintain it.

33. Indeed, one of Oracle's privacy policies provides that: "Oracle has implemented and will maintain technical and organizational measures designed to prevent accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Services Personal Information. These measures, which are generally aligned with the ISO/IEC 27001:2013 standard, govern all areas of security applicable to the Services, including physical access, system access, data access, transmission, input, security oversight, and enforcement."[1]

[1] *See* https://www.oracle.com/legal/privacy/services-privacy-policy/#1-4 (last visited Aug. 10, 2025).

34. Albany Health also provides patients with a Notice of Privacy Practices (the "Privacy Policy") that describes the way Albany Health and its hospitals (like GFH) may use and disclose its patients' PII/PHI, tells patients "our health care providers are committed to safeguarding the confidentiality of your protected health information."[2]

35. Thus, due to the highly sensitive and personal nature of the information Defendants acquire and store with respect to their patients and their clients' patients, Defendants promise to, among other things, keep patients' Private Information private; comply with industry standards related to data security and the maintenance of patients' Private Information; inform patients of their legal duties relating to data security and comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services they provide; and provide adequate notice to patients if their Private Information is disclosed without authorization.

36. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties they owed to Plaintiffs and Class Members, and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

37. Without the required submission of Private Information from Plaintiffs and Class Members, Albany Health, GFH and Oracle Health could not perform the services they provide.

---

[2] *See* https://www.albanymed.org/wp-content/uploads/sites/2/2025/05/25_Notice-of-Privacy-Practices_8.5x11.pdf (last visited August 11, 2025).

38. Plaintiffs and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendants ultimately failed to do.

**B. <u>The Data Breach and Defendants' Inadequate Notice to Plaintiffs and Class Members</u>**

***i. The Data Breach***

39. As described herein, Oracle detected unauthorized access to its legacy Cerner servers on or around February 20, 2025, with such unauthorized access starting on or after January 22, 2025.

40. At some point after February 20, 2025 Oracle sent notices to impacted customers informing them of a "cybersecurity event involving unauthorized access to some amount of your Cerner data that was on an old legacy server not yet migrated to the Oracle Cloud."[3]

41. Oracle has not sent written notice of the Data Breach to any victims. In fact, it was reported that Oracle is informing hospitals that it will not be notifying patients directly and that it is the hospitals' responsibility to determine if the stolen data violates HIPAA laws and whether they are required to provide notice.[4]

42. Oracle has not disclosed the details of the cyberattack with its customers or its customers' patients, including root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical

---

[3] *See Oracle Health breach compromises patient data at US hospitals*, https://www.bleepingcomputer.com/news/security/oracle-health-breach-compromises-patient-data-at-us-hospitals/ (last visited August 11, 2025).

[4] *Id*.

facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

43. This "disclosure" amounts to no real disclosure at all, as it fails to inform Oracle's customers as well as Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

44. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

45. The attacker accessed and acquired files in Oracle Health's servers containing unencrypted Private Information of Plaintiffs and Class Members, including, upon information and belief, their names, Social Security numbers, and health and/or clinical information.

46. Oracle offered absolutely zero substantive steps to help victims like Plaintiffs and Class Members protect themselves.

47. Oracle had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

48. Plaintiffs and Class Members provided their Private Information to Oracle with the reasonable expectation and mutual understanding that Oracle would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

49. Oracle's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

50. Oracle knew or should have known that its electronic records would be targeted by cybercriminals.

51. Albany Health Med Systems is a regional healthcare provider that offers medical services to patients in New York and western New England, including through GFH and affiliated facilities.

52. As a condition of provision of healthcare services, Albany Health collects and maintains highly sensitive patient information, including names, addresses, dates of birth, Social Security numbers, insurance details, medical histories, and treatment records.

53. Albany Health engaged Oracle Health to provide electronic health record (EHR) and related data services, including the management and migration of patient data.

54. On or about June 2, 2025, GFH received a list from Oracle of the patients whose data that was affected in the Data Breach.

55. On August 1, 2025, GFH issued written notifications to affected patients, including Plaintiff, informing them that personal information may have been involved in the incident.

56. The compromised data varied by individual and included combinations of names, dates of birth, Social Security numbers, driver's license numbers, treating physicians, dates of service, diagnoses, treatment information, and insurance data.

57. Albany Health and GFH knew or should have known of the risks involved in sharing unencrypted patient data through transitional systems and failed to implement sufficient safeguards or vendor oversight mechanisms to prevent or mitigate the harm resulting from the breach.

**C. <u>The Healthcare Sector is Particularly Susceptible to Data Breaches</u>**

58. Defendants were on notice that healthcare entities are particularly susceptible targets for data breaches.

59. Defendants were also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[5]

60. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[6]

---

[5] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited Aug. 10, 2025).

[6] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited Aug. 10, 2025).

61. The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[7] In 2022, the largest growth in compromises occurred in the healthcare sector.[8]

62. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[9] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

63. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

64. Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total

---

[7] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report,* https://www.idtheftcenter.org/2018-data-breaches/ (last visited Aug. 10, 2025).

[8] Identity Theft Resource Center, *2022 End-of-Year Data Breach Report,* https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited Aug. 10, 2025).

[9] *See* Identity Theft Resource Center, *2021 Data Breach Annual Report*, 6 (Jan. 2022), https://notified.idtheftcenter.org/s/ (last accessed Feb. 15, 2024).

cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[10]

65. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[11]

66. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[12]

67. A ransomware attack is a type of cyberattack that is frequently used to target healthcare providers due to the sensitive patient data they maintain. In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and

---

[10] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited Aug. 10, 2025).

[11] *Id*.

[12] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited Aug. 10, 2025).

demanding payment to restore control over the network. Ransomware attacks are particularly harmful for patients and healthcare providers alike as they cause operational disruptions that result in lengthier patient stays, delayed procedures or test results, increased complications from surgery, and even increased mortality rates. In 2021, 44% of healthcare providers who experienced a ransomware attack saw their operations disrupted for up to a week and 25% experienced disrupted services for up to a month.[13]

68. An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[14] In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[15] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[16] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[17]

---

[13] Sophos, *The State of Ransomware in Healthcare 2022* (May 2022), https://assets.sophos.com/X24WTUEQ/at/4wxp262kpf84t3bxf32wrctm/sophos-state-of-ransomware-healthcare-2022-wp.pdf.

[14] *The chance of data being stolen in a ransomware attack is greater than one in ten* (July 13, 2020), https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/

[15] *2020 Quarterly Report: Ransomware Demands continue to rise as Data Exfiltration becomes common and Maze subdues* (November 4, 2020), https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

[16] *Id.*

[17] *Id.*

69. Accordingly, Plaintiffs and Class Members believe that their Private Information was or will be sold on the dark web or privately on other underground markets, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

70. As a healthcare services providers, Defendants knew, or should have known, the importance of safeguarding their patients' Private Information, including PHI, entrusted to them, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on patients as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**D. Defendants Failed to Comply with HIPAA**

71. Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendants left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

72. Plaintiffs allege, on information and belief, that Oracle Health functioned as a 'business associate' under HIPAA and that Albany Health Med and GFH were each a 'covered entity,' and all Defendants were therefore subject to HIPAA's security rule and breach notification requirements. While HIPAA itself does not provide a private right of action, its standards and security requirements inform the duty of care and industry practices Defendants were obligated to follow.

73. Defendants' Data Breach resulted from a combination of insufficiencies that indicate Defendants failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from the Data Breach that Defendants failed to

implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

74. Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by 45 CFR § 160.103.

75. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

76. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

77. Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

78. Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

79. It is reasonable to infer that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

80. It is reasonable for Plaintiffs and Class Members to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

81. Defendants could have prevented the data breach by implementing HIPAA-mandated, industry-standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

82. Defendants' security failures also include, but are not limited to:

a. Failing to maintain adequate data security systems to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendants create, receive, maintain, and transmit in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 CFR 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

83. While monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure Defendants' approach to information security is adequate and appropriate going forward. Defendants still maintain the PHI and other highly sensitive PII of their current and former patients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

### E. <u>Defendants Failed to Comply with FTC Guidelines</u>

84. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[18]

85. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

[18] *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

86. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

87. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

88. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

89. Defendants were at all times fully aware of their obligation to protect the Private Information of its customers' patients yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### F. Defendants Failed to Comply with Industry Standards

90. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

91. Some industry best practices that should be implemented by businesses dealing with sensitive PHI like Defendants include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware

software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

92. Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

93. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

94. Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### G. **Defendants Breached their Duty to Safeguard Plaintiffs' and Class Members' Private Information**

95. In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with

industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

96. Defendants breached their obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems, servers and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain adequate data security systems that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect their patients' Private Information;

c. Failing to properly monitor their data security systems for existing intrusions;

d. Failing to sufficiently train their employees regarding the proper handling of their clients' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g. Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

97. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access their computer networks and systems which contained unsecured and unencrypted Private Information.

98. Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

99. Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

### H. Defendants Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft

100. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers, like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[19] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

101. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

102. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a

---

[19] *FTC Information Injury Workshop, BE and BCP Staff Perspective* (October 2018), https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited Aug. 10, 2025).

data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

103. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

104. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

105. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[20] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

[20] *See* FTC, *IdentityTheft.gov,* https://www.identitytheft.gov/Steps (last visited Aug. 10, 2025).

106. Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including medical identity theft, credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information.

107. PHI is also especially valuable to identity thieves. As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[21]

108. Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

109. While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[22]

110. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

---

[21] FTC, *Warning Signs of Identity Theft,* https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Aug. 10, 2025).

[22] Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited Aug. 10, 2025).

111. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[23]

112. The ramifications of Defendants' failure to keep its customers' patients' Private Information secure are long-lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

113. The value of PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

114. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

---

[23] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," Kaiser Health News (Feb. 7, 2014), https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited Aug. 10, 2025).

[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 10, 2025).

115. For example, Social Security numbers are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as may be experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[25]

116. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

117. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[26]

---

[25] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 10, 2025).

[26] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Aug. 10, 2025).

118. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[27]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

119. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

120. As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

## I. <u>Plaintiffs' Experiences and Damages</u>

*Plaintiff Dillon Greeno's Experience*

121. Plaintiff Greeno is and at all relevant times has been a resident of New York who has been receiving medical services and treatment from GFH since August 1987.

122. As a condition of receiving medical services and treatment from GFH, Plaintiff Greeno was required to provide Defendants with substantial amounts of his PII and PHI.

---

[27] GAO, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/assets/270/262904.html (last visited Aug. 10, 2025).

123. At the time of the Data Breach Oracle Heath retained Plaintiff Greeno's Private Information in its systems.

124. On or about August 1, 2025, Plaintiff Greeno received a notice from GFH that his PII and PHI, including his Social Security Number, driver's license number, date of birth, treating physician, dates of service, medication information, insurance information and treatment and/or diagnostic information, has been accessed in the Data Breach.

125. Plaintiff Greeno greatly values his privacy and would not have provided his Private Information to Defendants, undertaken the services and paid the amounts he had for medical services had Defendants timely disclosed that their systems lacked adequate computer and data security practices to safeguard their patients' personal and health information from theft, and that those systems were subject to a data breach.

126. Plaintiff Greeno suffered actual injury in the form of having his Private Information compromised and/or stolen as a result of the Data Breach, including but not limited to (a) damage to and diminution in the value of his personal, health, and financial information – a form of intangible property that Plaintiffs entrusted to Defendants for the purpose of receiving healthcare services from Defendants; (b) violation of privacy rights; and (c) substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

127. As a result of the Data Breach, Plaintiff Greeno anticipates spending considerable time and money on an ongoing basis to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and protecting himself from medical fraud.

128. As a result of the Data Breach, Plaintiff Greeno has suffered anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Greeno is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

129. Plaintiff Greeno has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches.

*Plaintiff Marlene King's Experience*

130. Plaintiff Marlene King is and at all relevant times has been a resident of New York and is a current patient of GFH.

131. As a condition of receiving medical services and treatment from GFH, Plaintiff King was required to provide Defendants with substantial amounts of her PII and PHI.

132. At the time of the Data Breach Oracle Heath retained Plaintiff King King's Private Information in its systems.

133. On or about August 1, 2025, Plaintiff King received a notice from GFH that her PII and PHI, including her Social Security Number, driver's license number, date of birth, treating physician, dates of service, medication information, insurance information and treatment and/or diagnostic information, has been accessed in the Data Breach.

134. Plaintiff King greatly values her privacy and would not have provided her Private Information to Defendants, undertaken the services and paid the amounts she had for medical services had Defendants timely disclosed that their systems lacked adequate computer and data

security practices to safeguard their patients' personal and health information from theft, and that those systems were subject to a data breach.

135. Plaintiff King suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach, including but not limited to (a) damage to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiffs entrusted to Defendants for the purpose of receiving healthcare services from Defendants; (b) violation of privacy rights; and (c) substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

136. In addition, Plaintiff King suffered actual fraud where following the Data Breach she incurred several unauthorized charges on her credit card account.

137. As a result of the Data Breach, Plaintiff King anticipates spending considerable time and money on an ongoing basis to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and protecting himself from medical fraud.

138. As a result of the Data Breach, Plaintiff King has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. Plaintiff King is very concerned about the increased, substantial, and continuing risk of identity theft and fraud, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

139. Plaintiff King has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches.

**J. <u>Common Injuries and Damages</u>**

140. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

141. Further, and as set forth above, as a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members will be forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

142. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

143. Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

144. The Private Information maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

145. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants. Plaintiffs and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price paid by Plaintiffs and Class Members (or, in some cases, on their behalf) to Defendants was intended to be used by Defendants to fund adequate security of Defendants' system and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class did not receive the benefit of the bargain.

146. Additionally, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[28] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to other companies.[29] Consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[30]

147. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in

---

[28] *See* Data Coup, *The personal data revolution*, https://datacoup.com/ (last visited Aug. 10, 2025).

[29] *What is digi.me?,* https://digi.me/what-is-digime/ (last visited Aug. 10, 2025).

[30] Nielsen Computer & Mobile Panel, *Frequently Asked Questions,* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Aug. 10, 2025).

an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

148. Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

a. Monitoring for and discovering fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Addressing their inability to withdraw funds linked to compromised accounts;

d. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

e. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

f. Contacting financial institutions and closing or modifying financial accounts;

g. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

h. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

i. Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

149. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly

sensitive personal and health information of its customers' patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

150. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## CLASS ACTION ALLEGATIONS

151. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Rule 23 of the Federal Rule of Civil Procedure, on behalf of the following Nationwide Class, subject to amendment as appropriate:

> All individuals whose Private Information was compromised in the Data Breach and who have received a Data Breach notice from Defendants.

152. Plaintiffs also seek to bring this action on behalf of the following New York Subclass:

> All individuals residing in the state of New York whose Private Information was compromised in the Data Breach and who have received a Data Breach notice from Defendants.

153. The Nationwide Class and the New York Subclass shall be referred to herein as the Class.

154. Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

155. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

156. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

157. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of Class Members are ascertainable through Oracle's and its customers' records, including but not limited to, the files implicated in the Data Breach.

158. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. When Defendants learned of the Data Breach;

c. Whether Defendants' response to the Data Breach was adequate;

d. Whether Defendants unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

e. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

i. Whether Defendants breached their duty to Class Members to safeguard their Private Information;

j. Whether hackers obtained Class Members' Private Information via the Data Breach;

k. Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

l. Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

m. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

n. What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

o. Whether Defendants' conduct was negligent;

p. Whether Defendants' conduct was *per se* negligent;

q. Whether either Defendant was unjustly enriched;

r. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

159. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs individually. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

160. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

161. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

162. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

163. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On behalf of Plaintiffs and the Nationwide Class)

164. Plaintiffs restate and reallege all of the allegations in every preceding paragraph as if fully set forth herein.

165. Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

166. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security.

Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

167. Defendants owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b. To protect their patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to federal and state regulations including but not limited to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

168. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

169. Defendants' duty also arose because as health service providers Defendants were bound by industry standards to protect their patients' confidential Private Information.

170. Defendants hold themselves out as trusted data collectors, respectively, and thereby assume a duty to reasonably protect their patients' information. Indeed, Defendants, as direct data collectors, were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

171. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

172. Defendants, through its actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

173. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

174. Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

175. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA; and

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised.

176. Defendants had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions.

177. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised, exfiltrated, and/or misused, as alleged herein.

178. As a result of Defendants' ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

179. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

180. As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

181. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

182. The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

183. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

184. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**SECOND CAUSE OF ACTION**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class)**

185. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

186. Upon information and belief, Oracle entered into valid contracts with its clients, including Albany Health Med and GFH, to provide software products and/or services, including business associate agreements under HIPAA, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to Oracle.

187. Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendants agreed to receive and protect through their services.

188. The benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

189. Plaintiffs and the Class are also intended third-party beneficiaries of these contracts because recognizing them as such is appropriate to effectuate the intentions of the parties, and the circumstances indicate that Defendants intended to give the beneficiaries the benefit of the promised performance.

190. Defendants knew that if they were to breach these contracts, healthcare patients including Plaintiffs and the Class, would be harmed by, among other harms, fraudulent transactions.

191. Defendants breached their contracts when they failed to use reasonable data security measures and/or business associate monitoring measures, and allowed the Data Breach to occur.

192. As foreseen, Plaintiffs and the Class were harmed by Defendants' failure to use reasonable data security measures to securely store and protect the files in their care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information. Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class)**

193. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

194. Plaintiffs bring this claim in the alternative to their breach of third-party beneficiary contract cause of action.

195. Oracle, Albany Health, and GFH provide healthcare-related services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendants regarding the provision of those services through their collective conduct, including by Plaintiffs

and Class Members paying for services from Defendants (or having their insurance companies pay Defendants on their behalf).

196. Through Defendants' sale of medical services, they knew or should have known that they must protect Plaintiffs' and Class Members' confidential Private Information in accordance with Defendants' policies, practices, and applicable law.

197. As consideration, Plaintiffs and Class Members paid money (or money was paid on their behalf) to Defendants and turned over valuable Private Information to Defendants. Accordingly, Plaintiffs and Class Members bargained with Defendants to securely maintain and store their Private Information.

198. Defendants solicited, offered and invited Plaintiffs and Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to doctors or other healthcare professionals who then provided it to Oracle.

199. Defendants accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing healthcare-related services to Plaintiffs and Class Members.

200. In delivering their Private Information to Defendants and paying for healthcare services, Plaintiffs and Class Members intended and understood that Defendants would adequately safeguard the Private Information as part of that service.

201. Defendants' implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of their employees is restricted and limited to achieve an authorized

business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Plaintiffs' and Class Members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

202. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

203. Had Defendants disclosed to Plaintiffs and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to Defendants.

204. As providers of healthcare-related services, Defendants recognized (or should have recognized) that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class Members.

205. Defendants violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information. Defendants further breached these implied contracts by failing to comply with their promise to abide by HIPAA.

206. Additionally, Defendants breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information they created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

207. Defendants also breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

208. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

209. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

210. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2).

211. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

212. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by their workforce, in violation of 45 CFR 164.306(a)(94).

213. Defendants further breached the implied contracts with Plaintiffs and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

214. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 CFR 164.530(c).

215. Defendants further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

216. A meeting of the minds occurred, as Plaintiffs and Class Members agreed, inter alia, to provide accurate and complete Private Information and to pay Defendants in exchange for Defendants' agreement to, inter alia, protect their Private Information.

217. Plaintiffs and Class Members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

218. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

219. This cause of action is pleaded in the alternative to Plaintiffs' second and third causes of action above.

220. Plaintiffs and Class Members conferred a benefit on Oracle, Albany Health, and GFH by turning over their Private Information to Defendants and by paying for medical services

(or having their insurance companies pay for medical services) that should have included cybersecurity protection to protect their Private Information. Plaintiffs and Class Members did not receive such protection.

221. Upon information and belief, Defendants fund their data security measures entirely from its general revenue, including from payments made to it by Plaintiffs and Class Members (or on their behalf).

222. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Oracle, Albany Health, and GFH.

223. Oracle, Albany Health, and GFH have retained the benefits of their unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that they failed to provide.

224. Oracle, Albany Health, and GFH knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Oracle, Albany Health, and GFH profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

225. If Plaintiffs and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendants.

226. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Oracle, Albany Health, and GFH to be permitted to retain the benefit of their wrongful conduct.

227. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and/ or are at a continual substantial and imminent risk of suffering, injury, including but not limited to: (i) identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Oracle, Albany Health, and GFH fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

228. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Oracle, Albany Health, and GFH and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Oracle, Albany Health, and GFH from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

229. Plaintiffs and Class Members may not have an adequate remedy at law against Oracle, Albany Health, and GFH, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**FIFTH CAUSE OF ACTION**
**BREACH OF CONFIDENCE**
**(On behalf of Plaintiffs and the Nationwide Class)**

230. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

231. Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by Oracle, Albany Health, and GFH and ultimately accessed and acquired in the Data Breach.

232. As healthcare service providers, Defendants have a special relationship with their patients, including Plaintiffs and Class Members. Because of that special relationship, Defendants were provided with and stored Plaintiffs' and Class Members' Private Information and had a duty to maintain such Information in confidence.

233. Patients like Plaintiffs and Class Members have a privacy interest in personal medical and other matters, and Defendants had a duty not to disclose such matters concerning their patients.

234. As a result of the parties' relationship, Defendants had possession and knowledge of highly sensitive and confidential PHI and PII belonging to Plaintiffs and Class Members, information that was not generally known.

235. Plaintiffs and Class Members did not consent nor authorize Defendants to release or disclose their Private Information to an unknown criminal actor.

236. Defendants breached their duty of confidence owed to Plaintiffs and Class Members by, among other things: (a) mismanaging their computer systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of Plaintiffs' and Class Members' Private Information; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement adequate information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the Breach at the time it began or within a reasonable time thereafter; (g) failing to follow their own privacy policies and practices published to their patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiffs' and Class Members' Private Information to a criminal third party.

237. But for Defendants' wrongful breach of their duty of confidence owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

238. As a direct and proximate result of Defendants' wrongful breach of their duty of confidence, Plaintiffs and Class Members have suffered and will continue to suffer the injuries alleged herein.

239. It would be inequitable for Defendants to retain the benefit of controlling and maintaining Plaintiffs' and Class Members' Private Information at the expense of Plaintiffs and Class Members.

240. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
## (On behalf of Plaintiffs and the Nationwide Class)

241. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

242. In providing their Private Information to Defendants, Plaintiffs and Class Members justifiably placed a special confidence in Defendants to act in good faith and with due regard for the interests of Plaintiffs and Class Members to safeguard and keep confidential that Private Information.

243. As healthcare service providers, Defendants have a fiduciary relationship to their clients, like Plaintiffs and Class Members.

244. Because of that fiduciary relationship, Defendants were provided with and stored valuable and sensitive Private Information belonging to Plaintiffs and Class Members, which they was required to maintain in confidence.

245. Defendants accepted the special confidence their customers, Plaintiffs and Class Members placed in it.

246. In light of the special relationship between Defendants, Plaintiffs, and Class Members, whereby Defendants became guardians of Plaintiffs and Class Members' Private Information, Defendants became fiduciaries by their undertaking and guardianship of the Private Information, to act primarily for the benefit of their customers, including Plaintiffs and Class Members for the safeguarding of Plaintiffs and Class Members' Private Information.

247. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their customer relationships, in particular, to keep secure the Private Information of their customers, exercise utmost care in protecting the Private Information in their possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons, and to timely notify Plaintiffs and Class Members of a data breach and disclosure.

248. Plaintiffs and Class Members have a privacy interest in their Private Information.

249. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

250. Defendants breached their fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs and Class Members' Private Information and by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

251. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

a. The compromise, publication, and/or theft of their Private Information;

b. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

c. Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

d. The continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession;

e. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members and

f. The diminished value of the services they paid for and received.

252. As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiffs and Class Members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

**SEVENTH CAUSE OF ACTION**
**INVASION OF PRIVACY**
**(On behalf of Plaintiffs and the Nationwide Class)**

253. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

254. Plaintiffs and Class Members had a reasonable expectation of privacy in the Private Information Defendants mishandled.

255. As a result of Defendants' conduct, publicity was given to Plaintiffs' and Class Members' Private Information, which necessarily includes matters concerning their private life such as PII and PHI.

256. A reasonable person of ordinary sensibilities would consider the publication of Plaintiffs' and Class Members' Private Information to be highly offensive.

257. Plaintiffs' and Class Members' Private Information is not of legitimate public concern and should remain private.

258. As a direct and proximate result of Defendants' public disclosure of private facts, Plaintiffs and Class Members are at a current and ongoing risk of identity theft and sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

259. Plaintiffs and Class Members are entitled to compensatory, consequential and nominal damages suffered as a result of the Data Breach.

260. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(On behalf of Plaintiffs and the New York Subclass)**

261. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

262. New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

263. Defendants Albany Health and GFH are New York entities conducting business in New York, and their deceptive practices, along with those of Defendant Oracle Health, occurred within New York State.

264. By reason of the conduct alleged herein, Defendants engaged in unlawful practices within the meaning of N.Y. Gen. Bus. Law § 349. The conduct alleged herein is a "business practice" within the meaning of N.Y. Gen. Bus. Law § 349.

265. Defendants stored Plaintiffs' and the New York Subclass Members' Private Information in Defendants' electronic databases. Defendants knew or should have known they did not employ reasonable, industry standard, and appropriate security measures that complied with all relevant regulations and would have kept Plaintiffs' and the New York Subclass Members' Private Information secure and prevented the loss or misuse of that Private Information. Defendants did not disclose to Plaintiffs and the New York Subclass Members that their data systems were not secure.

266. Plaintiffs and the New York Subclass Members would not have provided their Private Information if they had been told or knew that Defendants failed to maintain sufficient security thereof, and its inability to safely store Plaintiffs' and the New York Subclass Members' Private Information.

267. As alleged herein in this Complaint, Defendants engaged in unfair or deceptive acts or practices in the conduct of consumer transactions in violation of N.Y. Gen. Bus. Law § 349, including but not limited to:

a. Representing that their services were of a particular standard or quality that they knew or should have known were of another;

b. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and the New York Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

c. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

d. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the New York Subclass Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, and HIPAA, which was a direct and proximate cause of the Data Breach;

e. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and the New York Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

f. Omitting, suppressing and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and Class Members' Private Information;

g. Omitting, suppressing and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the New York Subclass Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, and HIPAA, which was a direct and proximate cause of the Data Breach; and

h. Failing to timely notify Plaintiffs and the New York Subclass Members of the Data Breach in violation of their own privacy policies and HIPAA requirements.

268. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

269. Such acts by Defendants are and were deceptive acts or practices which are and/or were likely to mislead a reasonable consumer providing his or her Private Information to Defendants. These deceptive acts and practices are material. The requests for and use of such Private Information through deceptive means were consumer-oriented acts and thereby fall under the New York consumer fraud statute, N.Y. Gen. Bus. Law § 349.

270. In addition, Defendants' failure to secure patients' Private Information violated the FTCA and HIPAA and, therefore, violates N.Y. Gen. Bus. Law § 349.

271. Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard the Private Information of Plaintiffs and the New York Subclass Members, deter hackers and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

272. The conduct violated N.Y. Gen. Bus. Law § 349, in that it is a restraint on trade or commerce.

273. Defendants' violations of N.Y. Gen. Bus. Law § 349 have an impact and general importance to the public. Thousands of patients have had their Private Information stored on Defendants' electronic databases, many of whom have been impacted by the Data Breach.

274. As a direct and proximate result of these deceptive trade practices, Plaintiffs and the New York Subclass Members suffered injury including but not limited to:

a. The theft and compromise of their Private Information;

b. The loss of value of their Private Information;

c. Out-of-pocket costs associated with the prevention, detection, and recovery from identity theft;

d. Lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach;

e. The continued and increased risk to their Private Information;

f. Anxiety, emotional distress, and loss of privacy;

g. The loss of the benefit of their bargain with Defendants.

275. On information and belief, Defendants Albany Health and GFH formulated and conceived of the systems used to compile and maintain patient information within the state of New York, oversaw their data privacy program complained of herein from New York, and their communications and other efforts to hold participant data emanated from New York.

276. Defendants' implied and express representations that they would adequately safeguard Plaintiffs' and the New York Subclass Members' Private Information constitute representations as to the particular standard, quality or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of N.Y. Gen. Bus. Law § 349.

277. Accordingly, Plaintiffs, on behalf of themselves and the New York Subclass Members, seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**VIOLATION OF THE RIGHT TO PRIVACY**
**NEW YORK CONSTITUTION, ARTICLE I, § 6**
**(On behalf of Plaintiffs & the New York Subclass)**

278. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

279. The New York Constitution provides: "[n]o person shall be deprived of life, liberty or property without due process of law." (N.Y. Const., art. I, § 6.).

280. Plaintiffs and the New York Subclass Members had a legally recognized and protected privacy interest in the personal medical information provided to and obtained by Defendants, including but not limited to an interest in precluding the dissemination or misuse of this sensitive and confidential information and the misuse of this information for malicious purposes.

281. Plaintiffs and the New York Subclass Members reasonably expected Defendants would prevent the unauthorized viewing, use, manipulation, exfiltration, theft, and disclosure of their personal medical information.

282. Defendants' conduct described herein resulted in a serious invasion of the privacy of Plaintiffs and the New York Subclass Members, as the release of personal medical information, including but not limited to names, Social Security numbers, dates of medical services, and medical treatment information could highly offend a reasonable individual.

283. As a direct consequence of the actions as identified above, Plaintiffs and the New York Subclass Members suffered harms and losses including but not limited to:

a. Economic loss;

b. The loss of control over the use of their identity;

c. Harm to their constitutional right to privacy;

d. Lost time dedicated to the investigation of and attempt to recover the loss of funds and cure harm to their privacy;

e. The need for future expenses and time dedicated to the recovery and protection from further loss; and

f. Privacy injuries associated with having their sensitive personal medical information disclosed.

284. Plaintiffs and the New York Subclass Members seek compensatory damages, punitive damages, injunctive relief requiring Defendants to implement constitutionally adequate privacy protections, and such other relief as the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**DECLARATORY JUDGEMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

285. Plaintiffs restate and reallege the allegations in every preceding paragraph as if fully set forth herein.

286. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

287. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

288. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continue to owe—a legal duty to use reasonable data security to secure the data entrusted to them;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to them; and

d. Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

289. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to them.

290. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

291. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class Members' injuries.

292. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, request judgment against Oracle, Albany Health, and GFH and that the Court enter an order:

a. Certifying this action as a Class action, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper and adequate representatives of the Classes requested herein;

b. Awarding Plaintiffs and Class Members appropriate monetary relief, including actual damages, statutory damages, nominal damages, equitable relief, restitution, disgorgement, and statutory costs;

c. Awarding injunctive and other equitable relief as necessary to protect the interests of the Classes as requested herein;

d. Instructing Oracle, Albany Health, and GFH to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e. Requiring Oracle, Albany Health, and GFH to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. Requiring Oracle, Albany Health, and GFH to implement enhanced data security measures in order to better protect the PII and PHI in its possession and control;

g. Awarding Plaintiffs and Class Members prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

h. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

DATE: August 12, 2025

Respectfully submitted,

/s/ David S. Almeida
David S. Almeida (NY Bar No. 3056520)
Elena A. Belov (NY Bar No. 4080891)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (708) 437-6476
david@almeidalawgroup.com
elena@almeidalawgroup.com

Jeff Ostrow (*pro hac vice* forthcoming)
Steven Sukert (NY Bar No. 5690532)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-332-4200
ostrow@kolawyers.com
sukert@kolawyers.com

*Counsel for Plaintiffs & the Proposed Class*